**Robert G. CARR et al., Plaintiffs,**

v.

**NEW YORK STOCK EXCHANGE, INC., an Unincorporated Association, and American Stock Exchange, Inc., an Unincorporated Association, Defendants.**

**No. C–73–0367–SW.**

United States District Court,
N. D. California.

April 30, 1976.

Timothy N. Brown, Bruce M. Casey, Jr., Kerry C. Smith, Chickering & Gregory, San Francisco, Cal., for defendant American Stock Exchange Inc.; John J. Loflin, Lord, Day & Lord, New York City, of counsel.

John B. Bates, Donald G. McNeil, Pillsbury, Madison & Sutro, San Francisco, Cal., for defendant New York Stock Exchange, Norman R. Nelson, Edward J. Reilly, Russell E. Brooks, Milbank, Tweed, Hadley & McCloy, New York City, of counsel.

Charles M. Richardson, Jr., Corte Madera, Cal., Ronald Lovitt, J. Thomas Hannan, Lovitt, Hannan & Hennigan Inc., San Francisco, Cal., for plaintiffs.

## MEMORANDUM OPINION

SPENCER WILLIAMS, District Judge.

This case is presently before the court on three motions:

(1) Plaintiffs' motion to certify the class denominated in the amended complaint, pursuant to F.R.Civ.P. 23;

(2) Plaintiffs' motion to compel answers in oral examination, pursuant to F.R. Civ.P. 30(b)(6) and 37; and

(3) Defendant's motions to dismiss and for summary judgment pursuant to F.R.Civ.P. 56.

The amended complaint in this case alleges liability on the part of the New York Stock Exchange (Exchange) for the failure and forced liquidation of the brokerage house of Blair after its merger with the brokerage house of Schwabacher in 1969, and for losses sustained by the plaintiffs, who were investors in Blair. Liability is claimed to arise under Sections 6, 10(b) and 20(a) of the Securities Exchange Act of 1934 (the Act) and the Rules of the Securities and Exchange Commission (SEC) and the Exchange promulgated thereunder.

## I. DEFENDANT'S MOTION TO DISMISS

The amended complaint sets forth 12 counts of alleged violations of securities laws: Counts 1, 2, and 3 allege that the Exchange breached its contractual duties to the plaintiff investors under § 6 of the Act by permitting Blair to sell unregistered securities without a "knowledgeability letter" or full disclosure of Blair's financial condition. Counts 4, 5, and 6 allege that the Exchange violated its own Rules under § 6 of the Act by allowing Schwabacher to continue operation and to merge with Blair after serious violations of Exchange Rules

on recordkeeping, commingling, capital reserve ratios and Exchange audits. Count 7 relates further § 6 violations by the Exchange's suppression of material information concerning these violations from the plaintiffs and the public. Count 8 alleges a violation of Exchange Rules under § 6 in the sale of unregistered securities in Blair. Counts 9, 10, and 11 allege that the Exchange violated § 10(b) and SEC Rule 10b–5 by fraudulently omitting disclosure of information material to the sale of securities in Blair, by aiding and abetting Blair in issuing securities without necessary disclosures, and by engaging in a conspiracy with Blair to defraud plaintiffs. Finally, in Count 12 plaintiffs allege that the Exchange is a "controlling person" within the meaning of § 20(a) of the Act and is thus jointly and severally liable for the securities violations of Schwabacher and Blair. Each of the allegations of the complaint will be considered in turn below.

*The § 6 Claims*

■ Plaintiffs' claims arise out of two pertinent subsections of § 6: § 6(a) requires the execution of a contract between the SEC and any registered national securities exchange under which the exchange is bound to enforce "so far as is within its powers" compliance by its member firms with securities laws and SEC regulations; § 6(b) states that an exchange may not be registered and may not remain registered with the SEC unless its rules "include provision for the expulsion, suspension or disciplining of a member for conduct or proceeding inconsistent with just and equitable principles of trade."[1] There are two threshold issues in the application of these sections: First, do the plaintiffs have standing to assert an implied right of action either in tort or as third-party beneficiaries of the registration agreement between the SEC and the Exchange? Second, if they have standing, are their claims barred by the applicable statute of limitations? The court holds that plaintiff investors herein have standing under § 6 to pursue this action and that they are not barred by the applicable statute of limitations.

Defendants contend that by § 6 Congress intended to protect only the public customers of the Exchange and not private investors in the brokerage houses themselves. This contention is not without merit. There were no such investors in 1934 because brokerage houses were not permitted to incorporate until 1953. In addition, in 1970 Congress specifically excluded investors in brokerage houses from the protection afforded Exchange "customers" in the Securities Investors Protection Act.[2] However, courts have properly held that the Congressional intent in enacting § 6 was to protect all parties likely to be harmed by a breach of an exchange's self-regulation agreement with the SEC. The leading case of *Baird v. Franklin,* 141 F.2d 238, 239 (2d Cir.) *cert. denied* 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944) held that the New York Stock Exchange had a duty to public investors under § 6 to investigate Exchange members and to "suspend or expel members who it had reason to believe had been guilty of conduct inconsistent with just and equitable principles of trade." The courts did not reach the question whether those protected by the SEC-Exchange agreement

---

1. There is some confusion in the reported cases as to the exact source of the implied rights of action found under § 6. Actions based on a breach of duty under § 6 have been found to sound in tort. *Baird v. Franklin,* 141 F.2d 238 (2d Cir.) *cert. denied,* 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944). More recent cases have applied third party beneficiary contract theory to the duties established in the Exchange-SEC agreement mandated by § 6(a)(1). *Weinberger v. New York Stock Exchange* 335 F.Supp. 139 (S.D.N.Y.1971). The Ninth Circuit has dismissed the distinction with the observation that "the content of that duty is the same under either of the two theories." *Hughes v. Dempsey-Tegeler,* 534 F.2d 156, 166 (n.5) (9th Cir. 1976).

2. The 1970 Act states: " 'customers' shall *not* include any person to the extent that such person has a claim for property [which is] part of the capital of the debtor . . . ." 15 U.S.C. 78 fff(c)(2)(A)(ii). We realize that this provision would bar these plaintiffs if it had been operative at the time they purchased their securities in Blair. However, these purchases occurred in 1969, before SIPA's effective date.

mandated by § 6(a)(1) had an implied private right of action as third-party beneficiaries of that agreement, but implied that they would have that right. Subsequent cases have extended the scope of the implied right of action beyond the public customers of an exchange. In *Pettit v. American Stock Exchange,* 217 F.Supp. 21 (S.D.N.Y.1973) the court held that a corporation sustaining losses in the value of its securities due to the exchange's failure to regulate its member firms had an implied right of action under § 6. Recent cases have held that the implied right of action is vested in partners and investors in Exchange member firms as well. *New York Stock Exchange v. Sloan,* 394 F.Supp. 1303 (S.D.N.Y. 1975), *Weinberger v. New York Stock Exchange,* 403 F.Supp. 1020, CCH Fed.Sec.L. Rep. 95, 348 (S.D.N.Y.1975). *Sloan* and *Weinberger* were cited approvingly by the Ninth Circuit in *Hughes v. Dempsey-Tegeler & Co., Inc.* 534 F.2d 156 (9th Cir. 1976) (at n. 4), which extended the implied right of action under § 6 to a subordinated lender to a brokerage house. Plaintiff investors in the present case are in substantially the same position as the plaintiff in *Hughes* and are also entitled to § 6 protections. Plaintiffs here are among those

> members of the Exchange community who are intended to be benefited by such rules . . . and who stand in the kind of relationship to the firm which requires them to rely on its compliance with the rules. *Sloan, supra* 394 F.Supp. at 1310.

■ The gravamen of plaintiffs' § 6 allegations is that the Exchange has breached its contractual obligations under the written registration agreement with the SEC. *Weinberger, supra.* The applicable statute of limitations is therefore Cal.Code Civ.Pro. § 337(1) governing third-party suits on a written contract.[3] Under California law the beneficiary's cause of action accrues when the obligation is breached, and the action is not barred until *four years* after that date. This action was filed on March 8, 1973. The court therefore finds that plaintiffs are not barred by the statute of limitations from asserting their § 6 claims for those breaches of the SEC-Exchange agreement occurring after March 8, 1969.

■ While the scope of the implied right of action under § 6 is to be interpreted broadly, the scope of the duty owed by the Exchange must be circumscribed. The Securities Exchange Act is grounded in the concept of Exchange self-regulation. The § 6 mandate "to enforce so far as is within its powers," must be evaluated reasonably. *Hughes, supra.* While unfettered discretion on the part of the Exchange in the enforcement of its rules cannot be permitted under the Act, § 6 necessarily invests the Exchange with a great deal of discretion in the promulgation and enforcement of rules and in the supervision of Exchange members. *See, e. g., Rich v. New York Stock Exchange,* 379 F.Supp. 1122 (S.D.N.Y.1974).

■ In enforcing its rules and in making complex decisions on the suspension or forced liquidation of members, the Exchange must consider the often conflicting interests of the member firm, its partners, and investors, and the corporations whose securities are handled by the firm, as well as the Exchange's public customers. Under these circumstances it cannot be said, as plaintiffs here seem to contend, that complete suspension should automatically follow a firm's breach of Exchange rules. Nor does § 6 render the Exchange a guarantor of all its members' mismanagement or fraudulent activities. Indeed, § 6 requires only that the Exchange rules *provide for* the expulsion, suspension, *or disciplining* of member firms that are in violation of the Exchange rules. Within this context plaintiffs have a considerable task in establishing a § 6 breach by the Exchange. In *Hughes, supra,* the Ninth Circuit held that:

> As long as the Exchange takes prompt action to investigate alleged violations, and having ascertained that violations exist, takes action reasonably designed to

---

3. The section provides: "Within four years: 1. An action upon any contract, obligation or lia-bility founded upon an instrument in writing . . . ."

restore compliance with the rules, courts should not substitute their retrospective judgment concerning the appropriate action. 534 F.2d 156, 170 (9th Cir. 1976). Under this formulation of the duty, actual knowledge of a member firm's misconduct is not a prerequisite to the Exchange's § 6 liability. However, plaintiffs will have a heavy burden of proving that the Exchange failed to exercise reasonable diligence in its supervision of member firms, and that this failure was the cause of the injury complained of. *Baird v. Franklin,* 141 F.2d 238, 239 (2d Cir. 1944).

■ Of special importance in the case-by-case evaluation of these factors is the supervisory role of the SEC with regard to the alleged § 6 violations. Because the SEC is the governmental authority charged with the enforcement of the provisions of the Act, SEC endorsement of a particular regulatory action by an exchange should be given considerable weight by a court hearing a claim that the same action violates the Exchange's § 6 duty. *Hughes, supra,* 534 F.2d 156, 170 (9th Cir. 1976).

■ Applying these elements to the facts of this case the court finds that a failure in the exercise of reasonable diligence may be found only if the Exchange knew or had reasonable cause to know of a violation or suspected violation of a securities law, regulation or rule, or Exchange rule, and failed to proceed with requisite due care in view of the seriousness of the violation, pertinent SEC policies, the rules and practices of the Exchange, and the interests of the member firms, their security holders and the public customers of the Exchange.

■ The standards set out above for evaluating the Exchange's duties under § 6 must be tested on a case-by-case basis; the duties are not clear-cut and are not susceptible to resolution on a motion for summary judgment. This is particularly so where, as in this case, defendant's only affidavit as to the pertinent disciplinary actions and regulatory standards of the Exchange is by an interested party, the Exchange officer in charge of member regulation. *See Sartor v. Arkansas Natural Gas,* 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944). Consequently, the motion for summary judgment on the § 6 causes of action is denied except as noted below.

■ With respect to the issues remaining for trial several conclusions may be drawn: First, the Exchange's duties under § 6, both supervisory and disciplinary, pertain directly only to the SEC and the member firms. Plaintiffs' right of action is dependent upon a breach of the primary duty. Plaintiffs must thus demonstrate with specificity how the Exchange's regulation of Schwabacher and Blair violated the standard of due care stated herein and how such violations caused their injury. Furthermore, plaintiffs must show that such breaches occurred within the four-year statute of limitations applicable to this action. Finally, those portions of the complaint alleging a breach of the Exchange's duty to promulgate rules to protect the plaintiffs and others must be dismissed, as the obligation falls outside the duty owed to plaintiffs. Courts have uniformly held that these causes of action must lie against the SEC pursuant to its authority under § 19(b) of the Act to "alter or supplement" the rules and practices of any securities exchange. 15 U.S.C. § 78s(b). *Weinberger, supra, Gordon v. New York Stock Exchange,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975).

*The § 10(b) and SEC Rule 10b–5 Claims*

In their amended complaint plaintiffs abandon the allegation that the Exchange made material misrepresentations to them regarding Blair's capital position and Schwabacher's back office and capital accounts violations. The amended complaint alleges only that the Exchange failed to disclose material information to the Blair investors. Defendants contend that mere inaction does not give rise to 10b–5 liability, as omissions are actionable only if, in the context of material representations for which the Exchange was responsible, the omitted matter was necessary to make those representations not misleading. The Ninth Circuit in *Wessel v. Buhler,* 437 F.2d

279, 283 (9th Cir. 1971) seems to support this view:

> We find nothing in Rule 10b–5 that purports to impose liability on anyone whose conduct consists solely of inaction. On the contrary, the only subsection that has any reference to an omission [refers to] an omission occurring as part of an affirmative statement. We perceive no reason, consonant with the congressional purpose . . . thus to expand Rule 10b–5 liability.

*Wessel,* however, must be interpreted in light of the Ninth Circuit's later decision in *White v. Abrams,* 495 F.2d 724 (9th Cir. 1974), and in light of the Supreme Court's recent ruling in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668, 44 U.S.L.W. 4451 (1976). *White v. Abrams* established a "flexible duty test" under which the courts are to evaluate a number of pertinent factors involved in a securities transaction in determining whether a representation or omission violated § 10(b) and Rule 10b–5.[4] An action for fraud under § 10(b) will not lie unless a duty relationship has arisen. In addition, *Hochfelder* establishes that a private action under § 10(b) and Rule 10b–5 will not lie without scienter on the part of the party charged with the violations. 425 U.S. 194–206, 96 S.Ct. 1375, 1381–1387, 47 L.Ed.2d 668, 676–683, 44 U.S.L.W. 4451, 4454–4457 (1976).

▌ Under these tests it appears that in certain circumstances a securities exchange could be held liable under § 10(b) for failure to inform investors in a member firm of material information concerning that firm's financial and operating condition. It is also apparent that such a conclusion is not appropriate on a motion for summary judgment. We need not reach that point here, however, because we have concluded that plaintiffs' § 10(b) and Rule 10b–5 causes of action are barred by the applicable statute of limitations.

▌ In *Holmberg v. Armbrecht,* 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946), the Supreme Court held that in a federal securities action where the applicable federal securities statute is silent, the appropriate local law of limitation applies. It is well settled that in § 10(b) actions, the state law of the forum determines the applicable statute of limitations. *See, e. g., Maine v. Leonard,* 365 F.Supp. 1277 (W.D.Va.1973). In California, § 10(b) actions are governed by the general fraud statute, Cal.Code Civ. Pro. § 338, which permits suits for fraud or mistake for three years after discovery or constructive discovery of the fraud by plaintiff. *United California Bank v. Salik,* 481 F.2d 1012 (9th Cir.) *cert. denied* 414 U.S. 1004, 94 S.Ct. 361, 38 L.Ed.2d 240 (1973).

▌ Plaintiffs here hopefully suggest that the New York statute of limitations for fraud should apply. That statute permits an action up to six years after the fraud or two years after its discovery, whichever is longer. We can discover no cases suggesting that such a rule would be appropriate. While it is theoretically arguable that the alleged fraudulent omissions occurred in New York, it is more plausible to say that they occurred in California, where plaintiff investors were employed, where they purchased their securities in Blair, and where they themselves chose to bring this action. Furthermore, the federal policy in this circuit is heavily weighted toward consistency in the application of limitation statutes to securities fraud actions, and the forum state rule serves this end. *United California Bank, supra.* Almost all federal securities actions can be factually related to the state of the securities exchange, but this does not change the federal rule that in the absence of a limitation section in the federal securities statute, the forum state limitation rules apply.

Because Cal.Code Civ.Pro. § 338(4) and the federal equitable tolling doctrine are

---

4. These factors include: the relationship between the parties, the defendant's and plaintiff's access to information, the benefit the defendant receives from the relationship, the de-

fendant's awareness of plaintiff's reliance on the relationship in making investment decisions, and defendant's activity in initiating the transaction. 495 F.2d at 735–36.

practically identical, it is unnecessary for us to express an opinion as to whether the federal rule or the tolling doctrine of a forum state should govern in a federal securities fraud action. Although the Ninth Circuit applied the tolling rule of § 338(4) in *Turner v. Lundquist,* 377 F.2d 44 (9th Cir. 1967), that court stated in *United California Bank, supra,* that "the adopted state statute shall only run in accordance with the federal law which decrees that the statute does not begin to run until the fraud is, or should be, discovered." 481 F.2d at 1014 n. 7. The application of the statute in this case thus turns on a determination of the date when the plaintiffs discovered, or should have discovered, the alleged fraud.

 Defendant's motion for summary judgment might be granted on the ground that the amended complaint does not relate with sufficient particularity the elements of fraud required by Fed.R.Civ.P. 9(b). The court has had, however, the benefit of extensive briefing and oral argument on the alleged § 10(b) violations on previous motions, and we conclude that plaintiffs' § 10(b) claims are barred because each of the named plaintiffs had actual or presumptive knowledge of facts sufficient to put him on inquiry as to defendant's alleged fraudulent activities prior to March 8, 1970, three years prior to the filing of this action.

Plaintiffs argue that questions relating to the quantum of knowledge necessary in a particular case to constitute "discovery" of a fraud are too factually-based to be determined on a motion for summary judgment. While that might often be true, this case is an exception to the general proposition. The issues and facts are easily identifiable and well developed in the record. Operative or presumed knowledge of the alleged fraud in this case requires knowledge of three distinct factual issues:

(1) Did the plaintiffs know about Schwabacher's serious violations of SEC and Exchange rules and uncertain financial condition prior to March 8, 1970?

(2) Did the plaintiffs know before March 8, 1970 that the Exchange had any substantial role in the supervision and disciplining of member firms and the approval of the Schwabacher-Blair merger? and

(3) Did the plaintiffs know before March 8, 1970 that their securities in Blair had been rendered virtually worthless by the demise of Schwabacher/Blair, contrary to their expectations at the time of purchase?

These questions must all be answered in the affirmative. The uncontroverted facts indicate that the plaintiffs knew or should have been put on inquiry before March 8, 1970 of all of the factors material to their § 10(b) claims: (1) that Schwabacher had experienced serious Exchange rule violations and financial problems prior to its merger with Blair; (2) that the Exchange had a substantial role in the regulations of Schwabacher, the approval of the Schwabacher/Blair merger and the approval of plaintiffs as investors in Blair; and (3) that plaintiffs' investments in Blair were rendered virtually worthless as a result of Blair's financial and record-keeping difficulties.

The named plaintiffs were all registered brokers employed by the firms of Schwabacher or Blair. They cannot claim ignorance as to the general affairs of their brokerage houses or as to the ongoing, statutorily-mandated role of the defendant Exchange in the supervision and regulation of its members. Plaintiffs knew or should have known *at the time they purchased their securities in Blair* that Schwabacher's merger with Blair was occasioned by Schwabacher's mismanagement and Exchange rule violations. These experienced investors must be presumed to have knowingly taken into account the risks attending such a merger.

Plaintiffs allege they did not know before March 8, 1970 of the role of the Exchange in the merger of Schwabacher and Blair or in the sale of Blair's securities. Yet Count 9 of their amended complaint alleges that they were "induced and encouraged" to purchase the securities of Blair by the fact that they were required to obtain the ap-

proval of the Exchange before being permitted to acquire those securities. They cannot claim that they were induced to invest in Blair in 1969 by reliance upon the Exchange's oversight functions at the same time that they claim no knowledge of the Exchange's involvement until April 1972 or December 1974 (Amended Complaint at 21, Opposition Memo at 27).

Plaintiffs' statement that they did not know until December 1974 that signed "knowledgeability letters" were sometimes required by the Exchange from investors in member firms is not relevant to the discovery of the alleged fraud. These letters were not required pursuant to any Exchange rule or practice, and the fact that they were not used for the 1969 Blair investors is not relevant to the alleged fraud. When used, these letters do not contain any disclosures; in fact, they expressly provide acknowledgement by the investor that the Exchange has no duty to disclose information to the investor, and thus serve to release the Exchange from any liability concerning the securities of member firms.

Defendants have introduced evidence from deposition testimony that all of the nine named plaintiffs had substantial information prior to March 8, 1970 that their securities in Blair were worthless. (Memorandum in Support of Motion at 65–67). Since the essence of the fraud counts of the complaint is that plaintiffs were not informed at the time of purchase of the financial condition of Schwabacher/Blair, information that their securities have been rendered worthless (by Blair's unexpected failure) should have put them on notice of possible wrongdoing. Letters from Blair on December 17, 1969 informed Blair subscription purchasers that a moratorium on payments was in effect. As of December 31, Blair officials publicly acknowledged that Blair stock had no book value.

Finally, with respect to the history of Schwabacher, its massive record-keeping violations and financial condition, plaintiffs must be charged with constructive knowledge of a detailed SEC Release dated August 28, 1969 which detailed these condi-

tions, publicly censured the Schwabacher management, and outlined the disciplinary actions imposed upon the firm. In charging plaintiffs with this presumptive knowledge, the court is mindful of the plaintiffs' employment as registered professional brokers of Schwabacher and Blair during the time period in question. Defendant's motion for dismissal of Counts 9, 10 and 11 of the amended complaint on the ground that they are barred by the statute of limitations must therefore be granted.

*The § 20(a) Claim*

Plaintiffs contend that § 20(a) of the Securities Exchange Act should be applied against the Exchange as a "controlling person" in the sale of securities by Blair. In essence, § 20(a) provides for the joint and several liability of any person who, directly or indirectly "controls" any other person who is subject to liability under Chapter 2B of the Securities Exchange Act, unless such "controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

The reach of potential liability under this section is very broad. The broad treatment of the section is consistent with the liberal rules of construction afforded the Securities Exchange Act to achieve the Act's remedial purpose. *SEC v. First Securities of Chicago*, 463 F.2d 981 (7th Cir. 1972). Section 20(a) "has been interpreted as requiring only some indirect means of discipline or influence short of actual correction to hold a 'controlling person' liable." *Myzel v. Fields*, 386 F.2d 718, 738 (8th Cir. 1967), *cert. denied* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968).

Despite the broad reach given § 20(a) however, the purpose of the statute is misinterpreted if the direct or indirect control which forms the basis of liability is extended to the institutions created by the Act itself to regulate the securities markets. The present case is a clear example of the impossible Exchange position suggested by the plaintiff's interpretation of

§ 20(a). The Exchange is charged with a duty of regulating its member firms; the more closely it regulates, the more fully it becomes a "controlling person", "directly or indirectly" inducing the acts complained of, and the more susceptible to liability under § 20(a) it becomes. Moreover, this liability would attach whether the Exchange took positive actions in furtherance of a fraudulent scheme, or merely failed to prevent a fraudulent scheme on the part of its member firms. Under § 20(a) mere good faith or lack of knowledge of the scheme is not enough to avoid liability. *Moscarelli v. Stamm*, 288 F.Supp. 453 (D.C.N.Y.1968); *Myzel v. Fields, supra.*

The court is aware of only one reported court decision holding that a national securities exchange is a controlling person under § 20(a). *Hughes v. Dempsey-Tegeler & Co., Inc.,* [1973 Transfer Binder] CCH Fed. Sec.L.Rep. ¶ 94.133 (C.D.Cal. Sept. 4, 1973). The trial court found that the Exchange was not liable to a person who sustained losses on capital contributions to a member firm because the Exchange did take reasonable precautionary measures in supervision of that firm's representations to the investor. In so holding, however, the court overlooked the "direct or indirect inducement" test for liability which is set out in § 20(a) and applied the test commonly used to govern actions under § 15 of the Securities Act, 15 U.S.C. 77o : "that the controlling person had no knowledge of or reasonable ground to believe in the existence of facts by reason of which the liability of the controlled person is alleged to exist." While the court found the Exchange not liable under this misapplication of the statutory tests, it recognized the difficulties imposed by a possible finding of Exchange liability under the "controlling person" theory:

> To conclude otherwise would create a foundation for liability of a 'controlling person' for conduct taking place beyond the very system of controls which were in fact established, and would again appear to border upon a theory of strict liability . . . ." CCH Fed.Sec.L.Rep. at p. 94.-551 [1973 Transfer Binder].

The novelty of plaintiffs' § 20(a) allegation is underscored by the fact that, aside from the trial court decision in *Hughes,* there are no reported cases dealing with the possible role of a national securities exchange as a "controlling person." The Ninth Circuit decision in *Hughes* did not reach this issue because it found the plaintiff's claims barred by waiver, but the court's reasoning with respect to the § 6 claims is applicable to § 20(a) as well:

> Because the securities industry is a critical and sensitive part of our economic structure, the Exchange's regulatory approach should properly include an overview of the potential effects of its action. Flexibility in regulatory response is critical if the response is to be appropriate to the situation. 534 F.2d 156, 169 (9th Cir. 1976).

A holding that a national securities exchange was a "controlling person" for the purposes of § 20(a) would inhibit regulatory flexibility, would be contrary to the congressional intent in establishing the self-regulatory exchange system in the Act and would place the Exchange in an untenable position of strict liability for the fraudulent acts of brokerage houses and their employees. Accordingly, the 12th cause of action must be dismissed on the ground that it does not state a claim on which relief can be granted.

## II. PLAINTIFFS' MOTION FOR CONDITIONAL CLASS CERTIFICATION PURSUANT TO FED.R.CIV.P. 23(c)(2) AND 23(b)(3).

Plaintiffs request conditional certification as a class under Fed.R.Civ.P. 23(b)(3). The issues on this motion have been simplified by the Court's decisions on the motion for summary judgment. Because the § 10(b) and § 20(a) counts have been dismissed, the problems which may have been raised by individual issues of reliance and the dates of discovery of the fraud have been eliminated. However, even in its simplified form we find that this action does not meet the requirements of Rule 23(a) and (b). While the action in its present form presents questions of fact and law common to the class

which predominate over the individual questions involved, we find that additional requirements of Rules 23(a) and 23(b)(3) have not been met.

 The burden lies with the party seeking certification to demonstrate that the criteria of Rule 23 have been met. *Rutledge v. Electric Hose & Rubber Co.,* 511 F.2d 668, 673 (9th Cir. 1975). The fact that this is a conditional certification does not permit the court to avoid deciding whether the requirements of the Rule have been substantially met. *In Re Hotel Telephone Charges,* 500 F.2d 86, 90 (9th Cir. 1974).

*The Requirements of Rule 23(a)*

 The § 6 counts of the complaint are by their very nature common to the class as denominated, as they depend for their resolution on the determination of the scope of the Exchange's duty and actions of the Exchange with respect to Schwabacher and Blair, which affect the plaintiffs in common. For the same reason the claims of the named plaintiffs are typical of the proposed class. Finally, the named plaintiffs and their attorneys have proceeded in such a manner as to adequately represent the class. However, the plaintiffs here have completely failed to carry their burden under the first requirement of Rule 23(a) of showing that "the class is so numerous that joinder of all members is impracticable." In order for the court to be able to determine whether the class is so numerous that joinder of all the members would be impracticable, plaintiffs must show some evidence of, or reasonable estimate of, the number of class members. Mere speculation as to the number of members does not satisfy the Rule.

Plaintiffs have merely alleged that the class consists of "approximately 100" persons who purchased securities in Blair after March 9, 1969. After 2½ years of discovery they have failed to elaborate with any further specificity this speculative claim of numerosity.[5] This case is strikingly similar to *Male v. Crossroads Associates, Inc.,* 320 F.Supp. 141, 150 (S.D.N.Y.1970) where the court denied the class certification, stating:

[T]here is no showing of any sort as to how many members of the class there are. There are conclusory averments that the members of the class are 'numerous'. This is not sufficient. There are no *facts* averred, much less established, on the issue . . .

An additional factor in the determination of the practicability of joinder is the geographical distribution of the members of the class. *DeMarco v. Edens,* 390 F.2d 836 (2d Cir. 1968). The court notes that all of the named plaintiffs except two are residents of the Northern District of California. In a case where the number of class members is at best fairly small, plaintiffs must demonstrate additional reasons why joinder is impracticable; a showing of geographical distribution is thus necessary. Absent such a showing, and considering the presence within this district of all but two named plaintiffs, this court is unable to find joinder impracticable. *See Sarbone v. Levin,* 73 Civ. 3018 (S.D.N.Y. March 26, 1974).

 In this connection, plaintiffs' assertion that vital information pertaining to the size of the class is contained within the records of the Exchange and not available to plaintiffs is without merit. Plaintiffs waited for 25 months after the filing of this action to even request class certification; their pending discovery motion makes no reference to the information that is claimed vital to their class motion. In view of this approach to the burden of proof they bear under Rule 23, they cannot not claim that the information has been unfairly withheld.

---

**5.** Plaintiffs' most concrete statement is contained in an affidavit by their attorney that: "Nevertheless he has reviewed such records as have been produced and determined that more than 75 stockholders' agreements with *Exchanges* relating to purchases *likely occurring* after March 9, 1969 have been produced, a substantial number of which *may relate to po*-

*tential* class members. In addition thereto, a review of financial workpapers of Blair produced *indicates the possibility* that there are more than 25 additional purchasers of other forms of securities of Blair than stock (*there appears to be some overlap of purchasers of stock and other securities*). Hannan affidavit of April 11, 1975 at 3. (emphasis added).

*The Requirements of Rule 23(b)(3)*

 While it appears from the complaint and record of this case that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members," the plaintiffs have not satisfactorily met the second requirement of the Rule "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R. Civ.P. 23(b)(3). Among the factors to be taken into consideration in determining superiority are the interests of individuals in controlling the litigation, and the extent of other litigation pending on the same issues. An examination of these factors in the present case indicates that a class action is not the superior method of adjudication.

This present suit is not a case where each claim is so inconsequential that members of the class could not press the suit individually. Each named plaintiff and each potential class member is a sophisticated investor with large losses in securities in Blair. They also have, individually, a large stake in controlling the course and outcome of the litigation. *See, Dolgow v. Anderson,* 53 F.R.D. 664 (S.D.N.Y.1971), aff'd., 464 F.2d 437 (2d Cir. 1972). Sixteen of the potential class members have filed an action against Blair in New York; the defendant here has introduced evidence that seven of those sixteen, when informed of the present class suit, would not allow themselves to be added as plaintiffs.[6] We are aware of course that the suit filed against Blair must be grounded in securities fraud under § 10(b) and Rule 10b–5, claims totally different from the § 6 claims pressed against the Exchange here. Considering the sophistication of the plaintiffs and the size of their claims, and the diversity of interest between those suing Blair and those suing the Exchange, the class action cannot be considered a superior method of adjudication of this action. *Reilly v. Frederick,* CCH Fed. Sec.L.Rep. ¶ 95,417 (No. 73–G–1173, N.D.

Alabama, January 12, 1976). This conclusion, together with the plaintiffs' failure to denominate with the requisite specificity the size and geographical distribution of the class, compels the court to deny the motion for conditional class certification.

### III. PLAINTIFFS' MOTION TO COMPEL DEPOSITION TESTIMONY

 By their motion to compel answers in deposition, pursuant to Fed.R.Civ.P. 30(b)(6) and 37, plaintiffs seek to compel the testimony of Mr. Robert Bishop on the following matters:

1. The procedure followed by the Exchange in promulgating and amending Exchange rules;
2. The deponent's interpretation of Exchange Rule 313D relating to the sale of unregistered securities in a member firm to the firm's employees; and
3. The deponent's understanding of his scope of responsibilities under Exchange Rule 313 as it existed in 1969.

Defendant's counsel objects to the above lines of questioning on the grounds that they are irrelevant to the well-pleaded causes of action in the suit, require legal conclusions on the part of a non-lawyer, and are repetitious.

Under Fed.R.Civ.P. 30, deposition testimony may be compelled if the information sought is reasonably calculated to lead to the discovery of admissible evidence. It is not an adequate objection that the questions posed may not themselves produce admissible evidence. Under this liberal rule, those questions reasonably related to the counts of the complaint still remaining for trial will be found to be competent, and Mr. Bishop's answers will be ordered.

The court notes that Mr. Bishop, as the head of defendant Exchange's Department of Member Firms during the time period relevant to this suit, is an uncommonly important witness to the just resolution of this case. Although the additional testimony

---

**6.** As these proposed plaintiffs cannot avoid the statute of limitations they will now be barred from pursuing either § 10(b) or § 6 claims in this forum. The court notes that this would

have been true even if the court had ruled on this class certification motion from the bench after oral argument on May 16, 1975.

requested may cause him some inconvenience, his testimony on these matters cannot be held to be of such marginal relevance that it would be patently unfair to compel his testimony.

However, the scope of this additional discovery will be limited by the court's decision on the defendant's motion to dismiss (see Part II, above). As discussed above, neither the Exchange's procedure for the promulgation of rules, nor the failure of the Exchange to enact particular rules give rise to Exchange liability on private causes of action. Such actions must lie with the SEC. *Weinberger, supra; Gordon, supra.* Consequently, questions relating to Exchange rule-making procedures and Exchange Rule 313 after the date of the sale of securities to plaintiffs are not relevant to the complaint as it now stands, and they will be disallowed.

Accordingly, the court hereby orders that upon proper notice the deposition of Mr. Robert Bishop may be taken with regard to his understanding of the scope of his duties and the Exchange enforcement procedures under Exchange Rule 313 as it existed and was interpreted by him and his Department in 1969. Plaintiff should refrain from phrasing questions in such a way that they require legal conclusions, rather than personal observations from Mr. Bishop.

Therefore,

IT IS HEREBY ORDERED that the motion to dismiss counts 1 to 8 of the complaint is denied except insofar as it refers to those portions of the complaint alleging a breach of the Exchange's duty to promulgate rules of conduct for members; for these portions, the motion to dismiss is granted.

IT IS FURTHER ORDERED that counts 9, 10, and 11 of the amended complaint are dismissed;

IT IS FURTHER ORDERED that count 12 of the amended complaint is dismissed;

IT IS FURTHER ORDERED that plaintiffs' motion for conditional class certification is denied;

IT IS FURTHER ORDERED that plaintiffs' motion to compel deposition testimony of Mr. Robert Bishop is granted except as limited in this decision.